IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 23, 2018 Session

## WILLIAM THOMAS FIALA v. KELLY LAUREN FIALA

**Appeal from the Circuit Court for Davidson County**
**No. 11D-1279        Phillip R. Robinson, Judge**

_____

### No. M2017-01280-COA-R3-CV

_____

Mother appeals the trial court's finding that a material change in circumstance occurred affecting the best interests of the child and that the child's best interests were furthered by naming Father primary residential parent. We affirm the trial court's judgment as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed as Modified**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which ARNOLD B. GOLDIN and KENNY ARMSTRONG, JJ., joined.

Donald Capparella, Nashville, Tennessee, for the appellant, Kelly Lauren Fiala.

William L. Harbison and Lisa K. Helton, Nashville, Tennessee, for the appellee, William Thomas Fiala.

### OPINION

### Background

Plaintiff/Appellee William Thomas Fiala ("Father") and Defendant/Appellant Kelly Lauren Fiala ("Mother") were divorced in 2013.[1] At that time, the parties entered into an agreed permanent parenting plan regarding their minor son ("the child"). The plan named Mother primary residential parent and awarded her 261 days with the child, while Father enjoyed 104 days. Generally, Father had parenting time with the child one night per week and every other weekend. In 2015, Father married Jackie Fiala ("Stepmother")[2]

---

[1] Both Mother and Father are attorneys.
[2] Stepmother is also an attorney.

and Father and Stepmother later had another child together. There is generally no dispute that Father's relationship with Stepmother began prior to the divorce. As such, Mother's relationship with Father and Stepmother was strained at best.

On August 27, 2015, Father filed a petition to modify the permanent parenting plan and child support, to designate Father as primary residential parent, for an ex parte restraining order awarding him immediate temporary custody of the child, to hold Mother in contempt, and for other relief. Father filed the petition on the basis that Mother was causing irreparable harm to the child by alienating the child from Father, causing a hostile environment for the child whenever Father and Stepmother were present, acting hostile to Father and Stepmother when the child was present, and calling Stepmother obscene names in the child's presence. Mother answered the petition and admitted that Father's remarriage was a material change in circumstances. According to Mother, upon Father's remarriage, the relationship between herself, the child, and Father was "dramatically impacted" by Stepmother's "gross[] interfer[ence] in the relationship between the parties." Mother did not, however, ask for any affirmative relief.

The trial court denied Father's request for an ex parte restraining order awarding him temporary custody of the child by order of August 28, 2015. In the same order, however, the trial court did restrain Mother from discussing Father's petition with the minor child, from interfering in Father's and Stepmother's relationship with the child, from discouraging the child from communicating with Father and Stepmother, and from creating a hostile environment for the child while Father and Stepmother are present.

A three day trial was held on April 25 & 26 and May 2, 2017. Twelve witnesses testified at trial. Each witness generally stated that the child was happy, healthy, has a good relationship with Mother, Father, and all other caretakers, is well-behaved, and doing well at school both academically and socially. According to Father, however, throughout the years following the entry of the divorce decree, Mother had often refused to follow the parenting plan by refusing to make the child available, delaying Father's ability to pick up the child, or attempting to interfere in Father's scheduled parenting time. Moreover, Father testified that Mother had subjected Father, Stepmother, and the child to multiple instances of hostility. According to Father and Stepmother, Mother's hostility, particularly toward Father's relationship with Stepmother, had caused the child to be frightened, anxious, and distressed at times, both at Mother's current behavior and the child's anticipation of Mother's reaction to certain events. In support of this testimony, Father submitted several emails, text messages, and video recordings as evidence of Mother's hostile behavior toward Father and Stepmother and how it affects the child.

In particular, the exhibits include video and transcript from a June 2014 exchange of the child. Prior to this exchange, Father had admittedly taken the child to another state for a family visit without Mother's permission. Father testified that Mother refused to allow the visit, even though it was during his parenting time. Stepmother undisputedly

accompanied Father on the trip, which occurred prior to their marriage; Father testified, however, that Father and Stepmother stayed in different rooms. Regardless, upon return of the child, Mother informed the child that "Daddy kidnapped you." Mother then threatened to prevent Father from seeing the child until Father returned to court. Other exhibits show that Mother often threatened Father with denial of parenting time based upon her conditions, including a demand to inspect Father's new home after he moved and a demand that Father sign an agreement that Stepmother have no contact with the child.

A September 2014 video and transcript show Mother talking about Father's extra-marital affair with the child present. Father also submitted video and transcript from a May 2015 T-ball game in which Mother hurled insults at Stepmother,[3] refused to allow the child to participate in the game due to Stepmother's presence, blamed Father for "ruin[ing]" the event, disagreed with Father that she could prevent Father from being a part of the child's life, and told the child that Father did not love him. The child can be seen crying and hiding behind a tree during this incident. According to Father, this incident was the "straw that broke the camel's back" that caused him to file the modification petition.

Video and transcript from a later May 2015 phone call reveals an incident wherein Mother attempts to entice the child to abandon scheduled parenting time with Father in favor of time with her. The child, however, declines Mother's invitation, choosing to remain with Father. In response, Mother informed the child that Father "is brainwashing you." The child denied that Father told him what to say on this call; Mother was not persuaded. The child then stated "Mommy doesn't believe me."

Father and Stepmother testified that the insults and interference did not terminate upon the entry of the restraining order, but rather continued into 2016. For example, in February 2016, Father and Stepmother testified to an incident where Mother insulted Stepmother at one of the child's ball games. When confronted, Mother told Father that they could avoid the comments if they stopped attending the child's activities. Another video was played from July 2016 in which the child becomes hysterical at the prospect that Mother will know that Stepmother is present at an exchange. The child, visibly crying, repeatedly begs Father to drop Stepmother off so that Mother will not see her, apparently out of fear of Mother's reaction.

Later, in November 2016, video and transcript showed an incident wherein Mother initially refused to allow the child to attend a Cub Scout event during Father's parenting time, insisting that Father and another child that Father brought to the event were not able to attend the event because it was school-related. Other videos and transcript show Mother repeatedly discussing the litigation in front of the minor child. Also in November

_____

[3] Specifically, Mother stated that Stepmother is never allowed to come to the child's ball games or even talk to the child and calls Stepmother "bitch," "whore," "disgusting," and "mistress." despite acknowledging that the child can hear Mother's comments.

2016, Father testified that as he was attempting to accommodate Mother's desire not to see Stepmother by parking his car far from Mother, Mother asked why Father was "hiding your whore?"

Despite these incidents, Father and Stepmother both testified that they have a strong relationship with the child. Likewise, the child is strongly bonded to his half-sibling. According to both Father and Stepmother, the child is healthy, happy, and thriving. Nevertheless, they testified that Mother's hostility has caused the child to be "petrified" of causing Mother's anger, even by doing so little as leaving a gift that Mother gave him at Father's home.

Mother did not deny that she had acted inappropriately during some of the videos, particularly the May 2015 T-ball incident. Mother testified, however, that her ire was sometimes justified by Father's decision to engage in an extra-marital affair and to allow the child to be around Stepmother. Mother also testified that she generally never refused Father's visitation and even often accommodated changes to the parenting schedule requested by Father. Documentary proof was presented to support Mother's testimony on this issue. Indeed, Father admitted that following the divorce, Mother had accommodated his request to change the hours of his parenting time to give him more useable time with the child. Moreover, the proof showed that Father sometimes did not utilize all of the parenting time provided for him in the permanent parenting plan. Mother testified that she also involved Father in other decisions, such as which school the child was to attend, despite having authority over education decisions in the permanent parenting plan. According to Mother, despite her offer for Father's input, Father made little effort to investigate the schools and ultimately agreed with her suggested private school.

Mother also testified that Father was also guilty of inappropriate behavior in the child's presence. For example, evidence was presented that Father used derogatory names for Mother in his cell phone address book; the child would use the phone when in Father's custody to speak to Mother.[4] In October 2014, Mother also suffered from an aneurysm that caused her to be hospitalized for some time.[5] Following this diagnosis, Mother testified that during a heated exchange of the child, Father stated that he hoped that Mother's "head explodes."[6] The evidence also showed that Father called Mother "a terrible mother" in front of the child and once described Mother as a "Grumpasaurus." Moreover, Mother took issue with Father's decision to allow the child around Stepmother prior to Father's remarriage, as the parties' parenting plan did not allow paramours to have overnight visits when the child was present.

---

[4] Father testified that he changed the names after the child learned to read.
[5] There is no dispute that Father did not exercise additional parenting time during Mother's hospitalization. Father explained that he chose to allow the child to remain near Mother and her side of the family during that time, given the seriousness of Mother's condition.
[6] Father denied this statement, testifying that he instead warned Mother that if she continued in such a heated fashion, her head would explode. Father also testified that Mother told the child following her aneurysm that Father "almost killed" Mother.

Finally, Mother testified that regardless of the incidents, the child was thriving in her care. Generally, the child was performing well in school, was involved in many different activities, and was undisputedly strongly bonded to Mother. Testimony showing that the child was doing well was corroborated by all the witnesses.

The trial court issued its purported final order on May 22, 2017, containing detailed findings of fact and conclusions of law. First, the trial court found that Mother's "overt refusal to comply with the parenting plan, her efforts to interfere with the Father's parenting time[,] and her sarcastic, denigrating behavior" were sufficient to show a material change in circumstance affecting the best interests of the child. The trial court thereafter went into an exhaustive review of the applicable best interest factors, ultimately concluding that changing custody to Father was in the child's best interests. Based on the trial court's findings, it ordered that Mother's parenting time would be suspended for a period of sixty days, during which time Mother was to participate in therapy with a court-appointed therapist.[7] Once Mother had participated in five therapy sessions and after the expiration of the sixty-day time frame, Mother could petition the court to implement a parenting plan naming Father primary residential parent and dividing the child's time 265 days to Father and 100 days to Mother.[8] A parenting plan was attached to the trial court's order. On November 22, 2017, the trial court entered a subsequent order dismissing Father's contempt petition and pending motions for sanctions. From these orders, Mother appeals.[9]

## Issues Presented

Mother raises two issues, which are taken from her brief:

1. Whether the trial court abused its discretion in changing custody from Mother to Father in a post-divorce petition.
2. Whether the trial court's award of Attorney's fees to Father should be reversed if the Court of Appeals also reverses the trial court's decision to change custody.

## Discussion

Decisions involving the custody of a child are among the most important decisions faced by the courts. *Steen v. Steen*, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001). When faced with a request to modify custody, courts generally favor the existing custody arrangement, on the premise that children tend to thrive in a stable environment. *Aaby v. Strange*, 924 S.W.2d 623, 627 (Tenn.1996); *Hoalcraft v. Smithson*, 19 S.W.3d 822, 828

---

[7] Mother was allowed visitation through Skype during this time.
[8] Largely, Mother's parenting time tracked Father's prior parenting time: every other weekend and one weeknight visit per week, although Mother's weeknight visit is not overnight.
[9] Both parties are represented by different counsel in this appeal.

(Tenn. Ct. App. 2001). Thus, there is "a strong presumption in favor of continuity of placement" of a child. *Morris v. Morris*, No. M2001-02275-COA-R3-CV, 2002 WL 31059222, at *2 (Tenn. Ct. App. Sept. 17, 2002) (quoting *Bah v. Bah*, 668 S.W.2d 663, 666 (Tenn. Ct. App. 1983)); *see also* Tenn. Code Ann. § 36-6-106(a)(3) (listing continuity as a factor in custody decisions). An existing custody order is considered res judicata on the facts as they existed at the time the order was entered. *Steen*, 61 S.W.3d at 327. However, "Tennessee courts are statutorily authorized to modify custody arrangements as necessitated by intervening changes in circumstances." *Conner v. Conner*, No. W2007-01711-COA-R3-CV, 2008 WL 2219255, at *2 (Tenn. Ct. App. May 29, 2008).

> The statute governing requests for such a modification provides:

> If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(B). Therefore, under the statute, the party seeking modification of the parenting plan to change the designation of the primary residential parent has the burden of proving a material change in circumstances. *See Taylor v. McKinnie*, No. W2007-01468-COA-R3-JV, 2008 WL 2971767, at *3 (Tenn. Ct. App. Aug.5, 2008) (citing *Kendrick*, 90 S.W.3d at 570). Only if the court finds a material change in circumstance does it proceed to consider whether changing custody is in the child's best interest. *Boyer v. Heimermann*, 238 S.W.3d 249, 259 (Tenn. Ct. App. 2007).

The determination of whether a material change in circumstance has occurred is a factual question. *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). Generally, we review the trial court's factual findings de novo on the record with a presumption that the trial court's findings of fact are correct unless the evidence preponderates otherwise. *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984); Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, the trial court's findings of fact that are based on witness credibility are given great weight, and they will not be overturned absent clear and convincing evidence to the contrary. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2002).

We note, however, that "[t]rial courts have broad discretion to fashion custody and visitation arrangements that best suit the unique circumstances of each case, and the appellate courts are reluctant to second-guess a trial court's determination regarding custody and visitation." *Reeder v. Reeder*, 375 S.W.3d 268, 278 (Tenn. Ct. App. 2012)

(citing ***Parker v. Parker***, 986 S.W.2d 557, 563 (Tenn. 1999)); see also C.W.H. v. L.A.S., 538 S.W.3d 488, 495 (Tenn. 2017) (quoting ***Armbrister v. Armbrister***, 414 S.W.3d 685, 693 (Tenn. 2013)) ("[D]etermining the details of parenting plans is 'peculiarly within the broad discretion of the trial judge."). "Decisions concerning custody and visitation often hinge on subtle factors, such as the parents' demeanor and credibility during the proceedings." ***Reeder***, 375 S.W.3d 268, 278–79 (citing ***Adelsperger v. Adelsperger***, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997)). We therefore do not "tweak [parenting plans] . . . in the hopes of achieving a more reasonable result than the trial court." ***Eldridge v. Eldridge***, 42 S.W.3d 82, 88 (Tenn. 2001). Thus, a trial court's decision regarding custody will be set aside only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." ***Id.***

This discretion extends to the question of which parent should be named primary residential parent. *See* ***Kathryne B.F. v. Michael David B.***, No. W2014-01863-COA-R3-CV, 2015 WL 4366311, at *8 (Tenn. Ct. App. July 16, 2015) (quoting ***In re Shayla H.***, No. M2013-00567-COA-R3-JV, 2014 WL 2601564, at *5 (Tenn. Ct. App. Jun. 9, 2014)) ("'[T]trial courts have broad discretion in determining which parent should be the primary residential parent[.]'"). "Thus, 'the ultimate question as to who should be the primary residential parent on appeal is whether the trial court abused its discretion in its selection.'" ***Id.*** (quoting ***Maupin v. Maupin***, 420 S.W.3d 761, 770 (Tenn. Ct. App. 2013)). While trial courts are afforded broad discretion in this area, "they still must base their decisions on the proof and upon the appropriate application of the applicable principles of law." ***Gaskill v. Gaskill***, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996) (citing ***D. v. K.***, 917 S.W.2d 682, 685 (Tenn. Ct. App. 1995)).

## Material Change in Circumstances

We begin with the first prong of any attempt to change a final custody order: whether the parent seeking the change has shown a material change in circumstance. Tenn. Code Ann. § 36-6-101(a)(2)(B). "In considering a petition to modify custody from one parent to the other parent, 'the 'threshold issue' is whether a material change in circumstances has occurred after the initial custody determination.'" ***McClain v. McClain***, 539 S.W.3d 170, 187–88 (Tenn. Ct. App. 2017) (quoting ***Kendrick***, 90 S.W.3d at 570). As this Court has explained:

> There are no bright line rules for determining when a change of circumstances should be deemed material enough to warrant changing an existing custody arrangement. ***Kendrick v. Shoemake***, 90 S.W.3d at 570; ***Taylor v. Taylor***, 849 S.W.2d [319,] 327 [(Tenn. 1993)]; ***Solima v. Solima***, 7 S.W.3d [30,] 32 [(Tenn. Ct. App. 1998)]. These decisions turn on the unique facts of each case. As a general matter, however, the following principles illuminate the inquiry. First, the change of circumstances must involve either the child's circumstances or a parent's circumstances that

- 7 -

affect the child's well-being. ***Kendrick v. Shoemake***, 90 S.W.3d at 570. Second, the changed circumstances must have arisen after the entry of the custody order sought to be modified. ***Turner v. Turner***, 776 S.W.2d 88, 90 (Tenn. Ct. App. 1989). . . . [Third], the change in circumstances must affect the child's well-being in some material way. ***Kendrick v. Shoemake***, 90 S.W.3d at 570; ***Blair v. Badenhope***, 77 S.W.3d [137,] 150 [(Tenn. 2002)]; ***Hoalcraft v. Smithson***, 19 S.W.3d [822,] 829 [(Tenn. Ct. App. 1999)].

. . . . If the person seeking the change of custody cannot demonstrate that the child's circumstances have changed in some material way, the trial court should not re-examine the comparative fitness of the parents, ***Caudill v. Foley***, 21 S.W.3d 203, 213 (Tenn. Ct. App. 1999), or engage in a "best interests of the child" analysis. Rather, in the absence of proof of a material change in the child's circumstances, the trial court should simply decline to change custody. ***Hoalcraft v. Smithson***, 19 S.W.3d at 828.

***Oliver v. Oliver***, No. M2002-02880-COA-R3-CV, 2004 WL 892536, at *3 (Tenn. Ct. App. Apr. 26, 2004) (footnote omitted).

Here, Father asserts that the finding of a material change of circumstance is supported by both Mother's own admission and by the trial court's detailed findings on this issue. Specifically, Mother's answer to Father's petition to change custody contains the following statement: "Mother admits that there has been a material change of circumstances affecting the child's best interest. Specifically, since the parties' divorce on February 5, 2013, Father married the woman with whom he was having an extramarital affair during the parties' marriage." This Court has previously accepted a parent's admission in his or her pleading that a material change in circumstance affecting the best interests of the child has occurred. *See **Wine v. Wine***, 245 S.W.3d 389, 392 (Tenn. Ct. App. 2007) (accepting mother's admission of a change in circumstance and significant variance in income for child support purposes); ***Rose v. Lashlee***, No. M2005-00361-COA-R3-CV, 2006 WL 2390980, at *2 (Tenn. Ct. App. Aug. 18, 2006) ("No evidence regarding the existence of a material change of circumstances was required because [father] had admitted in his answer that the circumstances had changed since the entry of the parenting plan. When the allegations in a complaint are admitted in the answer, the subject matter of the allegations is removed as an issue, and no further proof is necessary."). *But see **Williamson v. Lamm***, No. M2015-02006-COA-R3-CV, 2016 WL 5723953, at *5 (Tenn. Ct. App. Sept. 30, 2016) (holding that the proof did not establish a material change in circumstance affecting the best interest of the child even though father admitted that a material change in circumstance had occurred). We note, however, that Mother is correct in her assertion that although she admitted that a material change in circumstances existed, she did not admit that such change had any meaningful effect on the child.

Regardless, the trial court found that the proof showed a material change in circumstance affecting the best interests of the child, making detailed findings regarding Mother's interference in Father's time and relationship with the child, as well as various displays of hostility toward Father and Stepmother in the presence of the child. Mother argues, however, that there was no evidence to support this finding, as the evidence undisputedly showed that the child was well-mannered, happy, and had a close relationship with Father. Instead, Mother characterizes the facts of this case as punishing Mother for "a really bad day at child's ball game," similar to the facts in *Tomlin v. Leamon*, No. E2011-01398-COA-R3-CV, 2012 WL 586874 (Tenn. Ct. App. Feb. 23, 2012). In *Tomlin*, the trial court found a material change in circumstance based on mother's move, father's changed work schedule, and the children's expressed desire to spend more time with father. *Id.* at *2. This Court reversed, holding that the proof was insufficient to show that the changes had any meaningful effect on the children. *Id.* at *6. Although *Tomlin* also involved a "ball game incident" where Mother acted inappropriately, the trial court did not rely on this incident in support of its finding of changed circumstances. Indeed, the incident in question was the result of the mother's intoxication, rather than hostility toward the father. *Id.* at *2. *Tomlin* therefore is simply not analogous to the facts of this case.

This case does not involve a single incident that had no meaningful effect on the child. Rather, the evidence is overwhelming that Mother engaged in a pattern of hostile behavior toward Father often while the child was present. Mother's inappropriate behavior includes: (1) telling the child that Father did not love him; (2) accusing Father of kidnapping the child even though the child was returned to Mother on time; (3) telling the child that Father "brainwash[ed]" the child; (4) calling Stepmother "whore," "bitch," and other names in the child's presence and encouraging the child to have nothing to do with Stepmother, including even hugging her; and (5) refusing to allow the child to participate in activities because Stepmother was present.

The testimony, as well as the videos submitted into evidence, make clear that Mother's attacks on Father distressed the child. Particularly important is that the trial court expressly found Father's testimony credible, as it was supported by other evidence, including videos, emails, and text messages. The trial court's findings that rest on credibility are entitled to considerable deference on appeal and will not be overturned absent clear and convincing evidence to the contrary. *See In re M.L.D.*, 182 S.W.3d 890, 897 (Tenn. Ct. App. 2005) (citing *Sullivan v. Sullivan*, 107 S.W.3d 507, 510 (Tenn. Ct. App. 2002) ("Insofar as the trial court's findings are based on witness credibility, we give great deference to the trial court's findings and will not disturb those findings absent clear and convincing evidence to the contrary."). The videos are particularly telling. For example, in the video of the May 2015 ballpark incident, Mother can be heard calling Stepmother a "bitch" and informing the child that Father did not love him. As a result, the child, who was five years old at that time, cries and hides behind a tree. In another video taken in July 2016, the child becomes visibly upset when Father attempts to drop the

child off with Mother while Stepmother is present. The child begs Father not to allow Mother to see Stepmother, clearly out of fear of Mother's reaction. This particular incident, along with other instances where Mother exhibited disdain toward Father, occurred following Mother's agreement to be bound by the restraining order, leading the trial court to conclude that Mother's "hostility toward the Father and/or [S]tepmother remained undiminished" in spite of the restraining order.

It is true that the child is happy, healthy, and had generally not suffered long-term negative effects from Mother's outrageous behavior at the time of trial. As a reminder, Tennessee Code Annotated section 36-6-101(a)(2)(B) specifically states that "[a] material change of circumstance does not require a showing of a substantial risk of harm to the child." Thus, Mother's assertion that child has not been caused substantial harm by her actions does not negate the fact that the child has been obviously profoundly affected by the hostility between his parents. Clearly, a child who cries and hides behind a tree during a public outburst by his Mother, as well as goes into a panic when being dropped off at Mother's home with Stepmother present has been affected by these issues. The child's reactions during these incidents were indisputable, as they were captured on video. Additionally, Father and Stepmother testified to other incidents where the child was distressed by what he perceived to be Mother's reactions, including crying about losing a toy at Father's house because the toy belonged at Mother's house. According to the testimony, Mother and Stepmother's mere presence together causes the child to be "very upset, nervous, anxious, [and] crying." Moreover, Mother admitted the detrimental result of her behavior during her testimony, agreeing that her outbursts have had a "negative effect" on the child.

We concede that Father has not always exhibited the necessary maturity when dealing with Mother. Father's decisions to lie to Mother about taking the child out of state and to use inappropriate names for Mother in his cellphone are troubling to this Court.[10] However, the enmity sometimes displayed by Father does not negate Mother's hostility and its effect on the child. Rather, the fact that the parties cannot maintain some semblance of peace for the sake of their child only bolsters our resolve that a material change in circumstances has occurred that has had a meaningful effect on the child. Given the above evidence, as well as Mother's admission, we cannot conclude that the evidence preponderates against the trial court's finding that a material change in circumstance has occurred that affects "the child's well-being in a meaningful way." ***H.A.S. v. H.D.S.***, 414 S.W.3d 115, 123 (Tenn. Ct. App. 2013). As such, the trial court did not err in proceeding to consider the child's best interest with regard to custody.

**Best Interests**

---

[10] We note, however, that Mother points to no provisions of the previously agreed upon parenting plan that gives her the authority to prevent Father from taking the child on a trip during his parenting time. It appears that Father was required by the plan only to provide Mother an itinerary.

Having determined that Father met his burden to show changed circumstances affecting the child's well-being, we next consider the best interest factors contained in Tennessee Code Annotated section 36-6-106(a). The factors contained in section 36-6-106(a) are non-exclusive. ***Beyer v. Beyer***, 428 S.W.3d 59, 71 (Tenn. Ct. App. 2013). "Determining a child's best interest is a 'fact-sensitive inquiry'" that does not call for "'rote examination of each of [the relevant] factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case.'" ***Solima v. Solima***, No. M2014-01452-COA-R3-CV, 2015 WL 4594134, at *4 (Tenn. Ct. App. July 30, 2015) (quoting ***In re Marr***, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005)). Consequently, "the determination of what is in a child's best interest could turn on a single factor." ***Paschedag v. Paschedag***, No. M2016-00864-COA-R3-CV, 2017 WL 2365014, at *4 (Tenn. Ct. App. May 31, 2017), *perm. app. denied* (Tenn. Oct. 4, 2017) (citing ***In re Marr***, 194 S.W.3d at 499). In this case, the trial court made detailed findings as to each relevant factor; we will therefore consider each factor in turn.

1. **The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child; . . . .**

The trial court made the following findings with regard to this factor:

> The Court finds that each of the parties has a strong relationship with the minor child although the Mother's relationship is the stronger by virtue of the fact that the child is in her possession a greater period of time. The Court further finds that the Mother has set upon a course of conduct to denigrate and alienate the child from the Father and [S]tep[-]mother. Despite the Mother's efforts, the Court finds that the child still enjoys a good relationship with both his Father and [S]tepmother and enjoys his time with them. The Mother has clearly performed the majority of parenting responsibilities relating to the daily needs of the child. The Court finds that she has done so in an exemplary manner, caring for the child, feeding and clothing him; involving him in extracurricular activities; providing medical attention when necessary and assisting him with his schoolwork. However, the Court finds that she has not successfully parented the child as result of her unmasked hostility toward the Father and [S]tep[-]mother and her inappropriate behavior in the presence of the minor child. This consideration favors the Father.

Mother contends that the trial court's finding as to this factor was in error because the evidence was undisputed that she had been the child's primary caregiver throughout his life and under her care, the child was largely thriving, citing ***Crockett v. Hogan***, No. M2005-01788-COA-R3-CV, 2007 WL 2330857, *1–*2 (Tenn. Ct. App. Aug. 14, 2007).

In *Crockett*, we reversed a change in custody, noting that the evidence showed that the child had thrived in the mother's custody. The facts are not analogous, however, as the change in circumstances in *Crockett* was the mother's conviction for embezzlement, rather than naked hostility directed toward the child's other parent in the presence of the child. While the child is doing well in school, that simply does not negate the fact that Mother has purposefully chosen to engage in activity that visibly and profoundly distresses the child. The evidence therefore does not preponderate against the trial court's finding that Mother's behavior appears intended to alienate the child from Father and that her outbursts show a lack of stability. As such, the trial court's decision to find this factor favors Father was not in error.

2. **Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order; . . . .**

With regard to this factor, the trial court found as follows:

> The Court finds that the Father has the potential for adequate future performance of parenting responsibilities. However, the Court finds that based on the Mother's continuing anger and hostility toward the Father and [S]tepmother, she cannot and will not facilitate nor encourage a close and continuing parent-child relationship between the child and the Father consistent with the best interest of the child. The Court further finds, based on the Mother's history, that she will not honor nor facilitate the court-ordered parenting arrangements nor recognize the Father's rights as a parent. As noted in its findings, the Court finds that the Mother has violated both the letter of the court-ordered parenting plan and the spirit of co-parenting. This consideration strongly favors the Father.

Mother disagrees with this finding, noting that she often allowed Father additional parenting time or rescheduled visits due to Father's work schedule. Mother also contends that the trial court failed to consider the incidents wherein Father engaged in inappropriate behavior in front of the child, such as calling Mother a "Grumpasaurus[.]"

Again, we do not discount that Father has exhibited some inappropriate behavior

in this case. In the totality of the circumstances, however, Mother's complete lack of judgment with regard to her behavior towards Father and Stepmother in the child's presence far overwhelms the rather limited evidence concerning Father's misconduct. Here, Mother has engaged in repeated outbursts that have caused the child to fear being around Stepmother in Mother's presence. Regardless of Mother's feelings on this issue, Stepmother is a part of the child's life.[11] Mother's hostility and the child's resulting distress continued even after Mother agreed to restrain her conduct.

Moreover, the evidence shows that Mother repeatedly attempted to interfere in Father's parenting time by attempting to entice the child away from Father or placing inappropriate restrictions on Father during his parenting time. When Mother was upset, she also often threatened to prevent Father's contact with the child. As such, the evidence does not preponderate against the trial court's finding that Mother will not facilitate a close and loving relationship between Father and the child. A few instances of agreeing to accommodate Father's schedule simply cannot negate the fact that Mother has told the child that Father does not love him, directed the child not to have contact with his Stepmother without justification, and often acted in manner that interfered with Father's ability to parent the child.

3. **Refusal to attend a court ordered parent education seminar . . . .**

The trial court found this ground inapplicable. We agree.

4. **The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care; . . . .**

The trial court found that this factor was neutral, as both parents have provided the child with all necessary care. Mother does not dispute the trial court's finding on this factor.

5. **The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities; . . . .**

The trial court's findings on this factor were rather minimal:

> The Court finds that the Mother has taken the greater responsibility for performing parental responsibilities by virtue of her status as the Primary Residential Parent under the original parenting plan. However,

---

[11] As discussed, *infra*, the trial court found that Stepmother was an appropriate presence in the child's life.

based on her behavior described herein, the Court finds she has not done so successfully. This consideration favors the Father.

Mother strongly disagrees with the trial court's finding on this factor, noting that she has been the child's primary caregiver since the child's birth. Indeed, as Mother points out, Father agreed to the parenting plan under which the parties had heretofore been operating—a plan that named Mother primary residential parent and allowed her significant time with the child.

Father asserts, however, that the trial court was correct with regard to this factor, citing **Pack v. Rothchild**, No. E2016-00873-COA-R3-CV, 2017 WL 3106885 (Tenn. Ct. App. July 21, 2017). In **Pack**, the trial court found with regard to this best interest factor as follows: "Mother has historically been the primary caregiver due to her role as stay-at-home parent. This consideration is offset by her more recent actions to minimize Father's role." **Id.** at *4. With regard to other best interest factors, the trial court noted that Mother had not facilitated a relationship between the father and the children. In designating Father as the children's primary residential parent, the trial court relied in part on the fact that the mother "had unilaterally restricted Father's parenting time in the past, and it found that she would not facilitate a relationship with Father if she was designated the primary residential parent." **Id.** at *5. In **Pack**, however, the trial court found that the mother had restricted father's visitation to such an extent that father had at one point gone "an extended time without seeing" the children. **Id.** at *3.

The same is simply not true in this case. While we agree that Mother has not endeavored to facilitate a relationship between the child and Father, issues that are relevant to other best interest factors, the evidence shows that Mother has undisputedly been the child's primary caregiver throughout his life pursuant to an agreement with Father relative to their divorce. Although trial courts have broad discretion in this area of law, their decisions must be based on an appropriate application of the law to the facts presented. *See* **Gaskill**, 936 S.W.2d at 631. The trial court therefore erred in finding that this factor weighs in favor of Father.

6. **The love, affection, and emotional ties existing between each parent and the child; . . . .**

The trial court again made detailed findings with regard to this factor:

The Court finds that each of the parents loves their son and has great affection for him and strong emotional ties to him. In reviewing the Mother's behavior however, the Court has concerns over the Mother's attachment to the child. It appears to this Court that the Mother considers the child to be hers alone and that the Father has somehow waived any rights to the child by virtue of him seeking a divorce from the Mother. The Father divorced the Mother, not his child. Further, there is nothing in the

- 14 -

original parenting plan that suggests that the Father has waived any rights to the child. While he agreed for the Mother to make major decisions, it is obvious that these parties do not get along well, and making joint decisions could be extremely problematic. The Court has concerns that the Mother is overly attached or attendant to the child which may interfere with the child's development, self-confidence and independence. The Court notes the testimony of Catherine Kivett, the child's kindergarten teacher, who related that one of her goals with the child was to require him to be more independent. Irrespective, the Court finds this consideration to be neutral.

Mother takes issue with the trial court's findings on this ground, particularly the trial court's findings regarding Mother's over-attachment to the child. Still, the trial court found that this factor did not favor one party over the other. We agree. Here, the evidence presented was that the child is strongly bonded to both Mother and Father. As such, the trial court did not abuse its discretion in finding that this factor was neutral.

**7. The emotional needs and developmental level of the child; . . . .**

According to the trial court's finding on this factor,

The Court has heard little from either party regarding any emotional needs or developmental issues of the child. However, the Court has observed the child's demeanor and observed the impact of the Mother's behavior on the child in several videos. In the T-ball incident, evidenced in [the video recordings], the child is seen crying and in one segment of the video, he hides behind a tree and cries as the Mother berates the Father and denigrates the [S]tepmother. In another video, . . . the child is seen crying and fearful in the backseat of the Father's vehicle as he is driving the child back to the Mother's home at the conclusion of his parenting time. The [S]tepmother is in the car, and the child is begging the Father not to drop him off with the [S]tepmother present because of the child's concerns over the Mother's reaction. The Court finds it to be in the best interest of the minor child that the child be placed in counseling in an effort to help the child deal with the inappropriate behavior of the Mother and the modifications of the current parenting plan. The Court finds that the Mother cannot see the upset and damage she has inflicted upon her child as a result of her behavior. Because of the Mother's inability to understand or accept the import of her behavior on the child, the Court finds that the Father is the parent most capable of providing for the child's emotional needs. This consideration strongly favors the Father.

Mother contends that the evidence does not support the trial court's findings because the proof showed that the child is happy, healthy, and thriving under the current parenting plan. In addition, Mother points to the lack of proof that the child is in need of any psychological counseling. Essentially, Mother asserts that in the absence of "any lasting impact" on the child or "expert testimony that [the child] had suffered any serious or permanent emotional damage," the trial court's decision with regard to this factor should be construed as the trial court punishing Mother for these past incidents.

Respectfully, "[the] trial judge, as the fact finder, is not required to check his or her common sense at the door when considering evidence." *Eberting v. Eberting*, No. E2010-02471-COA-R3-CV, 2012 WL 605512, at *20 (Tenn. Ct. App. Feb. 27, 2012); *see also* ***Dattel Family Ltd. P'ship v. Wintz***, 250 S.W.3d 883, 892 (Tenn. Ct. App. 2007) (holding that the court "is not required to check common sense at the courthouse door"). Expert testimony is only necessary "when the subject matter requires that the court and jury have the aid of knowledge or experience not held by ordinary witnesses, . . . and where common knowledge furnishes no criteria for judgment or where proof depends on observation and analysis outside the common experience of jurors[.]" ***Hall v. State***, No. E2004-01635-CCA-R3-PD, 2005 WL 2008176, at *30 (Tenn. Crim. App. Aug. 22, 2005) (citation omitted) (citing ***Lawrence County Bank v. Riddle***, 621 S.W.2d 735, 737 (Tenn. 1981)). When faced with undisputed evidence that the child suffers what might be described by a laymen as a "panic attack" at the possibility of Mother seeing that Stepmother is with the child, the trial court correctly found that the child's emotional needs were not being met by Mother even in the absence of expert proof to that effect. In her continued campaign to make Father and Stepmother unhappy or uncomfortable, Mother largely ignored the impact that her outbursts were having on her child. The trial court therefore did not err in finding that this factor favored Father.

8. **The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. . . .**

The trial court made the following findings with regard to this factor:

> Because of the Mother's overt anger and hostility directed toward the Father and [S]tepmother, her seeming inability to control such behavior in the presence of the child and its impact on the minor child, the Court finds that the Mother is not emotionally fit to continue to parent the minor child at this time. This consideration favors the Father.

With regard to this factor, Mother's argument rests largely on her contention that the trial court's findings do not support the drastic remedy ultimately ordered by the trial court. Mother agrees that some of her behavior following the parties' divorce was inappropriate and regrettable. Rather, she argues that the trial court's decision to remove her from the child's life for a significant period of time was more detrimental to the child's emotional health than any of her prior behavior.

- 16 -

We note, however, that Mother has not designated as an issue the parenting schedule that was ordered by the trial court, nor has she raised the trial court's decision to remove the child from Mother's care pending counseling as an issue. Generally, this Court only considers issues that are properly designated as issues on appeal. *See, e.g., Childress v. Union Realty Co.*, 97 S.W.3d 573, 578 (Tenn. Ct. App. 2002) ("We consider an issue waived where it is argued in the brief but not designated as an issue."). Rather, the only issues properly raised by Mother in this appeal is whether the trial court correctly concluded that Father had shown both a material change in circumstance and that the child's best interest favored "changing custody" from Mother to Father. We therefore consider the trial court's findings above only in that context.

Here, the evidence shows that, for whatever reason, Mother has exhibited a pattern of behavior where she has been unable to control her hostility toward Father and Stepmother, resulting in verbal altercations in the presence of the child. Consequently, the evidence does not preponderate against the trial court's finding that Mother's emotional fitness is questionable. The trial court therefore did not err in finding that this factor favors Father.

9. **The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities; . . . .**

As the trial court found,

> The Father and [S]tepmother have a child which is the half-brother to the parties' minor son. The unrebutted testimony before the Court is that the parties' minor son is engaged with and has a good relationship with his new brother. Further, the Court finds that the parties' son has a good relationship with [S]tepmother. The Court also finds that the child has a good relationship with the maternal grandparents and other family members and close friends of the Mother's. The Court finds that maintaining such relationships is important and in the best interest of the minor child. Under the present parenting arrangement, the Mother is determined to prevent a relationship with [S]tepmother and as result, with the child's half-brother, Beau. The Court finds no evidence of any hostility by the Father directed at the maternal grandparents or the [Mother's] other family members. This consideration favors the Father.

Mother does not disagree with the trial court's factual findings with regard to this factor, but argues that the trial court abused its discretion in finding that this factor favors Father where the evidence was that the child has positive interactions with both sides of his family, is doing well in school, and participates in a multitude of activities while in Mother's care. Mother also argues that this evidence does not support the drastic reduction in parenting time afforded to Mother in the new parenting plan.

Respectfully, we disagree. Here, the trial court properly considered that while the child has a good relationship with both sides of his family, it was Mother who had exhibited a pattern of behavior that seeks to limit any relationship between the child and Stepmother, despite the fact that Stepmother is clearly part of both Father's and the child's post-divorce life. Mother's efforts in this regard are not merely reasonable inferences based on the evidence, but are in part based on her own admissions: in one email, Mother indicates that she will take action to prevent any contact between the child and Stepmother. In contrast, no evidence was presented that Father has undertaken any efforts to prevent the child's contact with Mother's family. Moreover, the evidence shows that Father was also involved in the child's activities, including sports and Boy Scouts. As such, the trial court did err in finding that this factor favors Father.

10. **The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; . . . .**

According to the trial court,

The Court finds that continuity of placement is generally in a child's best interest and promotes stability in the child's life. Since the parties' divorce in 2013 and indeed before, the child has lived with the Mother and she has been the primary caregiver. In light of the Court's findings in this cause however, the Court cannot find that the child has lived in a stable or satisfactory environment since the divorce. To the contrary, while the Mother professes her love for the child and has been a good caregiver, the Court finds the Mother's behavior as described above has been detrimental to the child and his relationship with his Father and [S]tepmother. This consideration favors the Father.

Of the factors that Mother asserts that the trial court incorrectly found, Mother appears to most take issue with the trial court's findings as to this factor. According to Mother, "[t]he trial court's analysis of this factor shows how far outside the spectrum of reasonable analysis its ruling wandered. Instead of simply acknowledging the overwhelming proof that Mother had been the child's primary caregiver since he was born, the Court" focused on Mother's hostile interactions with Father and Stepmother that were allegedly to the detriment of the child. Mother asserts, however, that any finding that Mother's behavior has had a detrimental effect on the child is wholly without evidentiary support.

Again, we respectfully disagree. As previously discussed, the trial court was well within the bounds of reasonableness to find that the child's well-being had been harmed by Mother's repeated outbursts and naked hostility toward the child's other parent. The child's distress is not speculative or hypothetical, as Mother suggests, but has been documented by both testimony and undisputed video proof. Still, we note that there can be no dispute that other than the fear and anxiety caused by Mother's behavior, the child

is largely thriving in the other areas of his life due, in part, to Mother's care. Moreover, there can be no dispute that continuity of placement favors Mother. Still, we must agree that Mother's own actions have caused a good deal of instability in the child's life, ultimately leading to this change of custody proceeding. As such, we modify the trial court's ruling to conclude that this factor favors neither party.

11. **Evidence of physical or emotional abuse to the child, to the other parent or to any other person. . . .**

The trial court made the following findings with regard to this factor: "The Court finds that the Mother's behavior toward the Father and Stepmother constitutes abuse, and her behavior in the presence of the minor child constitutes emotional child abuse. This consideration favors the Father. This Court has taken remedial steps in the ruling to protect the child." Mother argues, however, that this finding was in error in the absence of expert proof or sufficient facts to support the trial court's findings. As an initial matter, Mother cites no law to support any argument that findings of emotional abuse must be supported by expert proof.

The term emotional abuse is not defined in Tennessee Code Annotated section 36-1-106, or elsewhere in Title 36. Generally, the term abuse simply means "[t]o injure (a person) physically or mentally." ***Black's Law Dictionary*** 11 (9th ed. 2009). To be abusive, to be "characterized by wrongful or improper use" or to be "habitually cruel, malicious, or violent[.]" ***Id.*** at 12. Here, Mother's behavior towards Father and Stepmother concerning their marriage can be described as nothing short of abusive. In addition to hurling vicious and inappropriate names at Stepmother, Mother has also threatened Father's continued involvement with the child due to Stepmother's presence. We cannot conclude that Mother's action in directly exposing the child to the abuse directed at Stepmother and Father does not also constitute a form of emotional abuse. Indeed, the video proof submitted at trial shows that these interactions have a profound negative effect on the child. As such, the evidence does not preponderate against the trial court's finding as to this factor and, accordingly, the trial court did not err in finding that this factor favors changing custody to Father and instituting a plan to remediate these conditions.

12. **The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; . . . .**

The trial court again made detailed findings with regard to this factor:

The only adult person residing in either home is the [S]tepmother []. The Mother, in her pleadings, has alleged that [S]tepmother was "grossly interfering in the relationship between the parties, specifically as it relates to the parties' minor child." There is no competent evidence before the

- 19 -

Court that this allegation is true. It is without question that [S]tepmother was romantically involved with the Father prior to the entry of the final decree of divorce. The Court has no evidence that [S]tepmother was the cause of the demise of the parties' marriage. This question is not before the Court nor is it material to the issues under consideration. The Mother has cite[d] two incidents she alleges occurred prior to the marriage of the Father and [S]tepmother in which [S]tepmother allegedly behaved inappropriately. She alleged in one incident that [S]tepmother drove past her home while she, her mother, and the child were on the front porch. [S]tepmother allegedly made an obscene gesture directed towards the Mother. In the second incident, the Mother and the minor child drove by [S]tepmother's home and [S]tepmother allegedly screamed an obscenity at her. The Mother stopped the vehicle and chastised [S]tepmother. [S]tepmother, in her testimony, denied the first incident. She gave a different version of the second incident. She testified that she saw the child and the Mother driving past her home, and she waved to the child. She testified that the Mother did stop her vehicle and cursed her and told her not to wave to her child. Given the undisputed behavior of the Mother and her hostility toward the [S]tepmother, the Court finds [S]tepmother's testimony to be the more credible. It is the Mother who has admittedly called [S]tepmother vile and demeaning names and has insisted that the child have no relationship with the [S]tepmother or that the [S]tepmother even touch the child. Based on the evidence before it, the Court finds that [S]tepmother has a good relationship with the minor child and has great love and affection for the child. The Court finds [S]tepmother is not a threat of harm to the child nor has she interfered with the relationship of the parties or negatively impacted the minor child. The Court finds that this consideration favors the Father.

Mother contends, however, that in rejecting Mother's assertion that Stepmother's interference with the child constituted a material change in circumstances, no evidence in support of a material change in circumstance existed. Mother therefore asserts that the change in custody resulted from the trial court's desire to punish Mother for her outbursts.

As previously discussed, however, the trial court's finding of a material change in circumstance affecting the best interests of the child is supported by ample proof in the record. Specifically, a material change in circumstance occurred when, following the divorce, Mother chose to engage in a pattern of angry and hostile conduct toward Father and Stepmother that interfered with Father's ability to parent the child and caused the child anxiety, fear, and distress. The trial court's decision to change custody therefore did not result from a desire to punish Mother, but from an appropriate need to protect the child from Mother's behavior.

Returning to the evidence presented on this factor, there was simply no evidence presented that Stepmother was anything other than a positive influence on the child. Other than two disputed instances of alleged inappropriate conduct on the part of Stepmother, the evidence showed that Stepmother's character and conduct have been appropriate despite Mother's outbursts. Moreover, the trial court expressly rejected Mother's testimony concerning this alleged misconduct, finding Mother's testimony lacked credibility. As we noted earlier, we do not overturn findings that are based on credibility lightly and we discern no reason to overturn the trial court's express credibility findings in this case. *See In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2002). The proof showed that Stepmother has a loving and close bond with the child in spite of Mother's intrusion and that Stepmother is an appropriate person to have contact with child. The trial court's findings on this issue are therefore fully supported by the record. As such, the trial court did not err in finding that this factor favors Father.[12]

Based on the foregoing factors, the trial court ruled that custody would be changed to Father, immediately implemented a plan that severely limited Mother's contact with the child for a time, directed Mother to attend counseling, and ultimately entered a permanent parenting plan in which Father was named primary residential parent and Mother was awarded substantially less time with the child than she had previously enjoyed. Again, we note that Mother's appellate brief does not designate as an issue the plan that the trial court actually implemented or the trial court's order limiting Mother's contact with the child pending her participation in counseling. See, e.g., *Childress*, 97 S.W.3d at 578. Instead, the only issue raised on appeal is whether the trial court erred in changing custody to Father. Indeed, counsel for Mother stated at oral argument that the limited visitation following the trial court's order "is simply something that happened" that shows the punitive nature of the trial court's order. Given Mother's decision not to designate this as an issue, we consider the best interest factors with regard to the plan currently implemented.[13]

We discern no abuse of discretion in the trial court's decision to name Father primary residential parent and decrease Mother's time with the child in accordance with the permanent parenting plan ordered by the trial court. Here, Mother's frequent outbursts have clearly caused the child emotional distress and Mother continued in her negative behavior even after agreeing to be bound by the restraining order in this case. In our view, it should not be necessary for parents, particularly those who are attorneys and should be well-versed in Tennessee domestic law, to be ordered by judges not to denigrate the child's other parent and his or her life in the child's presence. The nature of

---

[12] Although section 36-6-106(a) contains additional factors, we confine our review to the factors considered by the trial court and relevant to this appeal.

[13] No motion for this Court to consider post-judgment facts was filed by either party. Given that this appeal was heard on May 23, 2018, exactly one year following the trial court's order changing custody to Father, we presume that the parties have been operating under the less restrictive parenting plan for some time.

divorce often means that a child will be outside one parent's control for significant periods of time, sometimes interacting with other individuals. Like it or not, Stepmother is a part of the child's life. As found by the trial court, any purported fears about Stepmother's character and her interactions around the child are completely unsupported by the evidence. Mother's behavior here toward Father and Stepmother was therefore not only unacceptable, it directly caused the child emotional harm. The fact that the child has not needed counseling or had visible long-term negative effects is simply not dispositive of which parent is better able to care for the child at this time. Here, Mother has shown a marked inability to facilitate the child's relationship with Father and Father's family. Given the totality of the circumstances, the trial court's decision to change custody to Father was not in error.[14]

## Conclusion

The judgment of the Davidson County Circuit Court is affirmed as modified. This cause is remanded to the trial court for all further proceedings as may be necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellant Kelly Lauren Fiala, and her surety, for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE

---

[14] Having affirmed the trial court's decision to change custody, we pretermit Mother's argument that the award of attorney's fees should be reversed in the event that this Court "reverses the trial court's decision to change custody."